**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0120n.06

No. 11-2542

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 11, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| CALVIN RAYMOND JONES, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: ROGERS, WHITE, and ALARCÓN, Circuit Judges.[*]

ROGERS, Circuit Judge.  Calvin Jones was convicted under 18 U.S.C. § 844(i) for participating in an arson with Samson Wright.  The issue at trial was whether Wright coerced Jones into participating.  The district court gave a jury instruction regarding duress, but the court limited Jones's ability to introduce evidence supporting his fear of Wright.  Because one of the issues for the jury was whether Jones reasonably believed there was a present, imminent, and immediate threat by Wright of death or serious bodily injury, the district court should have permitted Jones to testify regarding his knowledge of Wright's prior assaults and reputation for violence to inform the jury about why Jones may have been in fear of Wright.  Because we cannot say with fair assurance that the judgment was not substantially swayed by the error, the district court's decision not to allow Jones to explain his alleged fear requires reversal.

---

[*]The Honorable Arthur L. Alarcón, United States Senior Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

I.

On Friday, August 13, 2010, a store at 13147 East Jefferson Avenue, Detroit, Michigan burned down, engulfing three neighboring businesses. Seven firefighters were injured fighting the fire. The events that led to the fire began the day before, when the owner of the store hired Samson Wright to burn down the store for insurance money. Calvin Jones lived down the block from the store and was known to work on cars in his yard. Jones's first involvement in the arson was when he lent Frederick McKinney a chisel and a hammer that were eventually used to loosen bricks from the wall of the store to facilitate the arson. According to Jones, he did not know what the tools were being used for, but he knew that the tools would be used by Wright.

Later that day, Wright borrowed a ladder from someone else and bought a five-gallon gas can. Wright left the ladder and the gas can on Jones's porch. Around dusk, Wright and four friends made their first attempt at the arson. They carried the ladder and gas can to the store, and McKinney climbed the ladder and removed the loose bricks from the wall. Their plan was to use a funnel and a water hose to pour gasoline into the store; however the group abandoned the plan once they became concerned that a security guard from a nearby condominium complex could have seen them. They then carried the ladder and the gas can back to Jones's house.

The central dispute at the trial was what occurred next. According to Wright, Jones volunteered to help with the arson. Wright testified that after he returned to Jones's house with the group, Jones came out of his house and asked what happened. After learning what happened, Jones said that Wright should have sought his help with the arson in the first place. According to Wright,

he had not asked Jones to be involved, but Jones had overheard Wright talking about the arson with the other four participants. Wright testified that he agreed to work with Jones on the arson and that Jones suggested that they use plastic water bottles to put the gasoline behind the store's brick wall, rather than following Wright's earlier plan of using a funnel and a water hose. Wright testified that he never threatened Jones or forced Jones to do anything related to the arson.

Jones gave a different account of the events. According to Jones, after the failed attempt to light the fire, Wright came back to Jones's house where Jones was sleeping on the couch with his girlfriend. Wright knocked on the door and Jones answered it, stepping out of the house to talk to Wright. According to Jones, Wright offered to forgive a $200 debt that Jones owed to Wright if Jones would assist him with the arson. Jones rejected this offer. Wright then laid out three options: Jones had to immediately pay Wright back the $200 that he owed him, assist Wright with the arson, or be shot. According to Jones, Wright then pulled a pistol out of his pocket. Jones testified that he said, "I ain't worried about you shooting me because [my girlfriend is] in the house and she know I'm outside with you, so I ain't worried about you shooting me." Trial Tr. vol. 5, July 6, 2011, 485–89. According to Jones, Wright then threatened to burn down Jones's house with Jones's girlfriend and brother inside and then burn down Jones's girlfriend's house. Jones appears not to have taken this threat seriously because Jones replied, "go with that, 'cause I'm not fixin' to do nothing." *Id.* at 489. Jones then watched from his porch as Wright crossed the street and went into an area with overgrown plants. Wright returned with a gas can and began pouring gasoline around the base of the house and on the back porch, threatening "you don't believe me[?]" and flicking a

lighter. Jones testified that at that point he said "hold on" and agreed to help Wright, who had the idea to use the water bottles filled with gasoline. *Id.* at 492–93.

Wright and Jones filled the water bottles with gasoline and carried the bottles and the ladder back to the store. Jones held the ladder while Wright threw the bottles through the hole that McKinney had created earlier. Wright then started the fire, and they walked back to Jones's house as fire was shooting from the hole. After returning to his house, Wright asked Jones to drive him to the gas station. Jones drove Wright to the gas station where they purchased food. On the way back to Jones's house, as they were driving by the fire, Jones says that Wright told him that he would give him $200 in the morning and another $5000 once the insurance proceeds arrived. Jones claims he told Wright that he did not want any money.

The fire destroyed three other businesses, and seven firefighters were injured while fighting the fire. Based on a tip, officers arrested Wright on August 17, 2010 and charged him with arson. Although he initially denied participating in the arson, he admitted to it on August 20, 2010 and implicated Jones. Agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) interviewed Jones on August 18 and 19. Jones denied any involvement.

Officers arrested Jones on October 8, 2010. At that point, Jones admitted going with Wright to the store, but denied participating in the arson and did not mention that Wright forced him to participate in the arson. On November 30, 2010, during Jones's fourth interview with the ATF agents, Jones first told the agents about Wright's alleged threats.

Jones says he did not tell the agents earlier because he still feared that Wright would kill Jones or his girlfriend, or burn down his girlfriend's house. Even after Wright was arrested, Jones said he stayed silent because he thought that Wright may have told the owner of the store or someone else to hurt Jones or his family if Jones went to the police. However, once Jones's girlfriend decided to move, Jones decided to write a letter to his attorney telling about his participation in the arson and asking for his attorney to contact the ATF and the U.S. Attorney's office.

Jones's trial strategy was to focus on an affirmative defense of duress. Jones sought to introduce pieces of evidence explaining why Jones would fear Wright. The present appeal centers around evidentiary decisions by the district court.

Before the trial, the Government filed a motion *in limine* to preclude Jones from making a duress defense. The Government argued that Jones had not established a prima facie case of duress, so the district court should bar the defense or at least hold an evidentiary hearing to determine whether the prima facie case was met. The district court ruled that Jones could "attempt[] to make a showing at trial that there was duress at the specific time and place the alleged crime was committed." Order Granting in Part the Gov't's Mot. in Limine to Preclude Duress Defense, 2. The district court also issued an evidentiary ruling, however:

> To the extent Defendant intends to call witnesses to testify about Wright's bad acts that are removed from the time and place of the fire on August 13, 2010, particularly where such witnesses do not have personal knowledge of Jones being threatened, . . . Defendant's proposed duress evidence is not admissible pursuant to Fed. R. Evid. 404(b).

*Id.*

Jones filed a motion for reconsideration, describing evidence he sought to introduce. Jones wanted to establish prior assaults by Wright, Wright's reputation for violence, and Wright's tendency to carry a gun to inform the jury about why Jones has a well-founded fear of Wright the night of the arson. Jones proffered that he would testify that in 2010, Wright pulled a gun on him and demanded payment of a $30 debt, which Jones then paid, and that on another occasion Wright put Jones in a headlock and touched a bullet that is lodged in Jones's neck against his spine and then laughed about it after releasing Jones. Jones would also testify that he knew the following: "Wright shot Clifford Ellis in the rear end, and on another occasion Samson Wright hit Clifford Ellis over the head with a baseball bat to collect a claimed debt"; "Wright made a man strip naked, put a dog leash around his neck, made him bark, and paraded him down to E. Jefferson"; "Wright regularly carried a gun and a switchblade"; "Wright hit Meredith Hubbard . . . in the face with a hammer" and on another occasion "threatened to shoot Meredith Hubbard's dog and burn down Hubbard's house on Coplin, and Samson Wright came back with a gun"; and "Wright burned down his own house on 4610 Ashland, Detroit." Br. in Supp. of Mot. for Recons. or Hr'g as to the June 14, 2011 Order, 9. Jones sought to introduce this evidence via his own testimony, cross-examination of Wright, and the testimony of seven witnesses who said they had witnessed one or more of these events and would corroborate Jones's testimony. These witnesses would also testify to Wright's reputation for violence and other specific violent acts that Wright carried out.

At trial, the district court reaffirmed its previous ruling, saying "no testimony will be allowed that is not directly related to the crime." Trial Tr. vol. 5, July 6, 2011, 376. The district court looked at the elements of duress from *United States v. Johnson*, 416 F.3d 464, 468 (6th Cir. 2005),[1] and focused upon the requirement that the threat of death or serious injury be "present, imminent, and impending." Trial Tr. vol. 5, July 6, 2011, 377. The district court said: "The intent of the law is that you don't get exculpation for committing a crime based upon something you know about a person standing next to you . . . that frightens you about him. . . . [T]hat doesn't get you out of it. You've got to find a way out if you can." *Id.* Jones's counsel sought to clarify how some of the specific threats that Jones had knowledge of would be relevant, but the court rejected these arguments saying, "I can't think of what it's relevant to. You'd, I'm sure, would like to make it relevant to his state of mind when he acquiesced, allegedly, and got involved in criminal activity,

---

[1]As repeated in *United States v. Johnson*, the five elements of duress are:

> (1) that defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;
> (2) that the defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct;
> (3) that the defendant had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm;
> (4) that a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm;
> (5) that defendant did not maintain the illegal conduct any longer than absolutely necessary.

416 F.3d at 468 (emphasis removed) (quoting *United States v. Riffe*, 28 F.3d 565, 569 (6th Cir. 1994)).

but . . . I don't think it meets [the duress] test." *Id.* at 379. After testimony that Wright and Jones

got along, Jones's counsel renewed his argument:

> [JONES'S COUNSEL]: [I]n light of what the Government has brought out, that I'm requesting that my client be permitted to testify as to acts of violence, pulling a gun on my client on one earlier occasion, to acts of violence by Samson Wright, and grabbing him and pushing on a bullet that was in his neck.
>
> THE COURT: I don't understand—conceivably, it could be connected somehow, if Mr. Jones testified, it could be connected somehow to something else that would increase my understanding, but I don't understand how that goes to duress. I don't know what else you think it goes to. But duress, as it's defined in the law, and as it's described in the instructions from the Sixth Circuit, simply isn't met. The standard on duress is not met by something that happened three months ago or two years ago.
>
> And I suppose you can make a good argument that in some cases maybe it should, but you can make a good argument that it shouldn't too, that if you're going to talk about duress exculpating somebody, you better have almost up to the standard of self-defense, that you thought you were going to get hit right then and you couldn't get out and you couldn't get to the phone and you couldn't do anything else.
>
> I understand that's pretty much what the standard is, and so I don't think, if you're talking about duress, I don't think it makes any difference. I know it makes a difference in terms of the relationship between parties, if you believe that stuff, but I don't think it makes any difference in terms of what you'd like to argue about duress, and I've ruled on that.

*Id.* at 451–52.

The district court also rejected the admissibility of a witness's testimony that Wright

regularly carried a gun and had reputation for violence and another witness's testimony that Wright

had a reputation for violence. Presumably based on these rulings, Jones did not seek to cross-

examine Wright regarding the prior assaults.

The district court never explicitly explained how Jones satisfied the prima facie case for duress. The district court gave the Sixth Circuit's pattern jury instruction regarding duress, suggesting that the district court at least assumed that Jones had provided sufficient evidence for his defense to reach the jury. The jury convicted Jones of arson. Jones appeals from his conviction.

## II.

To the degree that Jones knew about Wright's prior assaults and reputation for violence, testimony regarding this knowledge should have been admissible for the purpose of proving Jones's fear of Wright. The district court's determination that this evidence was irrelevant was legal error. This error affected Jones's substantial rights because it deprived him of the ability to inform the jury about why he reasonably believed there was an immediate threat of death or serious bodily injury, an element of his defense of duress. As to the evidence regarding Wright's tendency to carry guns and the testimony of Jones's corroborating witnesses, the district court properly limited this evidence.

The district court gave a jury instruction relating to duress. Although the district court did not explicitly analyze the way in which Jones satisfied the prima facie case for duress, the district court appears to have at least assumed that Jones had done so. This court assumes for purposes of this opinion that Jones put forth a prima facie case of duress.[2]

---

[2] The Government argues on appeal that there was not in the first place a sufficient basis for the district court to permit evidence of duress and instruct the jury on duress. We do not address the force of this argument, however, because an error of a different sort would be presented by affirming on that ground. It would be unfair to permit a defendant to put on a defense that "I did it, but under duress," and then to hobble such a defense and deny a duress instruction. If Jones knew that duress

The district court's rulings appear to conclude that the evidence of Wright's prior assaults, reputation, and routine activity of carrying a gun was of no consequence in determining the defense of duress and was therefore irrelevant under Federal Rule of Evidence 401(b). The district court's view of relevance was legally erroneous. In *United States v. Callahan*, 551 F.2d 733, 736–37 (6th Cir. 1977), we held that allegations of prior acts in which a business would pay off unions as a matter of sound business judgment were relevant to the issue of whether a business leader was motivated by fear in paying off a union leader. Although the alleged prior acts were not directly related to the union leader's charged extortion, prior payments were relevant to the state of mind of the business supervisor. Although the factual context in this case is different, an analogous relevancy analysis applies.

It is well-recognized that a defendant's knowledge of prior violent acts by an alleged aggressor-turned-victim is relevant to a defendant's alleged fear in a self-defense case. *See, e.g.*, *United States v. Burks*, 470 F.2d 432, 434–35 (D.C. Cir. 1972). Similarly, a defendant's knowledge of prior violent acts, violent reputation, and routine carrying of a deadly weapon by an alleged coercer is relevant to a defendant's alleged apprehension in a duress case. If a defendant puts forth a prima facie case of duress, evidence related to the defendant's knowledge of prior violent acts is

---

was not on the table, he might have used a different litigating strategy. For instance, he might have declined to testify and put the Government to its burden of proof. In other words, our holding today is that *if* a duress defense is permitted, a defendant must be able to introduce evidence relevant to that defense, subject to the rules of evidence.

relevant to explaining to the jury why his apprehension was well-grounded and why he considered the threat to be present, imminent, and impending.

The Government argues that duress is not analogous to self-defense (1) because the rationale of self-defense is different from the rationale supporting duress, and (2) because Rule 404(a)(2)(B) provides special rules relating to victims in cases involving self-defense that do not apply to coercers in cases involving duress. Neither of the Government's arguments affects the Rule 401 relevancy analysis. While the rationales behind the defenses of self-defense and duress may be different, both defenses require the defendant to prove his fear of death or serious bodily injury. Even if the Government is correct that Rule 404 draws a distinction, this does not affect the relevancy analysis under Rule 401. The relevancy test in Rule 401 is typically the first step in determining admissibility. To argue that evidence is not relevant because another rule would bar it puts the cart before the horse. Even improper propensity evidence is relevant, even if it is not ultimately admissible due to Rule 404's limits on propensity evidence. *See Old Chief v. United States*, 519 U.S. 172, 181 (1997); *Michelson v. United States*, 335 U.S. 469, 475–76 (1948). The district court's disallowance of the evidence is not supportable on Rule 401 irrelevance grounds.

The district court's pretrial ruling barring Jones and others from testifying concerning acts by Wright prior to the night of the arson is also not supported by the limits on propensity evidence found in Rule 404. Rule 404(a) makes evidence of a person's character trait "not admissible to prove that on a particular occasion the person acted in accordance with the character or trait," and the exceptions in Rule 404(a)(2) regarding the traits of defendants and victims do not apply because

Wright was neither a defendant nor a victim. Rule 404(b) independently renders inadmissible "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But neither rule applies here because Wright's prior actions were not being introduced to show that Wright acted similarly in connection with the alleged coercion of Jones, but to show *Jones's* perception of the situation for duress purposes.

While evidence of Wright's character is not admissible to prove Wright's propensity to act in a certain way, this does not limit the admissibility of evidence of Wright's prior acts and Wright's reputation for violence to prove Jones's fear of Wright, a purpose distinct from proving that Wright acted in accordance with the character on the night of the arson. The admissibility of such evidence is reinforced by Rule 404(b)(2)'s examples of permissible purposes: proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident. The list is not exhaustive. *See, e.g.*, *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1980). In *Mendez-Ortiz* we held for instance that admitting spoliation evidence for purpose of showing a defendant's consciousness of guilt was not plain error. Evidence of Wright's assaults and reputation that Jones was aware of is admissible to prove Jones's "well-grounded apprehension of death or serious bodily injury" (the element of duress as stated in *Johnson*, 416 F.3d at 468). Although this purpose is not enumerated by Rule 404(b)(2),[2] it is a proper purpose for evidence to be admitted. In a case cited

---

[2] The purpose of proving fear is different from the enumerated purpose of "knowledge" in Rule 404(b)(2). The "knowledge" category in Rule 404(b)(2) is a limited exception that often goes to whether a defendant knows the risk of behaving in a certain way to show recklessness, knows a

with apparent approval by the advisory committee notes to the 1991 amendments to Rule 404, the Fifth Circuit held that evidence of a systematic campaign of threats and intimidation is admissible under Rule 404(b) when offered by a defendant to prove coercion. *See United States v. McClure*, 546 F.2d 670, 672–73 (5th Cir. 1977).

Whether Jones did in fact apprehend death or serious bodily injury on the night of the arson is a factual matter. *Cf. Burks*, 470 F.2d at 435 n.5. Once the district court decided to allow Jones to argue duress, it also needed to allow him to present facts that would explain his fear of Wright, even if the facts did not directly bear on the threat in the same way as facts such as Wright's use of the gun, gas can, and lighter, or the specific words that Wright used. On the night of the crime, after Wright threatened to shoot Jones, Jones expressed doubt that Wright would shoot him and Wright did not carry out his threat of shooting Jones. This suggests that the jury might have difficulty believing that Jones was in fear of Wright's threat of burning down Jones's house. From the direct evidence bearing on Wright's threat, it is impossible to know whether Wright was a bluffer that did not need to be taken seriously, or whether Jones had some basis to believe the threat with the gun was a bluff but the threat of burning down Jones's house was serious. Evidence of Wright's prior assaults and reputation for violence would inform the jury's assessment about whether to believe Jones's testimony that he feared Wright would follow through on his threat to burn down Jones's house.

---

statement is false to show scienter, or knows how to do something requiring specialized knowledge. *See, e.g.*, Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:34 (2012).

Admitting evidence relating to the defendant's fear is in accord with decisions by the First, Third, Seventh, Eighth, Ninth, and D.C. Circuits, which have each stated that in self-defense cases, evidence of prior acts by the alleged aggressor-turned-victim is admissible when the defendant was aware of the acts and the acts are being introduced to show why the defendant was afraid. *See United States v. Bordeaux*, 570 F.3d 1041, 1050 (8th Cir. 2009) (dictum); *United States v. Smith*, 230 F.3d 300, 307–08 (7th Cir. 2000); *United States v. Saenz*, 179 F.3d 686, 688–89 (9th Cir. 1999); *Lagasse v. Vestal*, 671 F.2d 668, 669 (1st Cir. 1982) (dictum); *Gov't of V.I. v. Carino*, 631 F.2d 226, 229–30 (3d Cir. 1980), *Burks*, 470 F.3d at 434–35; *see also* Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:25 (2012).

The Government cites a Ninth Circuit case, *United States v. Lynch*, 437 F.3d 902, 914–15 (9th Cir. 2006) (en banc), to argue that duress cases are handled differently than self-defense cases and thus prior acts by a coercer are not admissible. *Lynch* does not apply as broadly as the Government suggests. The holding in *Lynch* was limited to the coercer's prior acts of which the defendant was *unaware*. While *Lynch* supports the inadmissibility of prior acts by Wright that Jones was not aware of, the Ninth Circuit's concern with which of the events the defendant had knowledge of suggests that, if Jones had knowledge of Wright's prior assaults, reputation, or tendency to carry a gun, such testimony could be admissible.

We recognize that admitting evidence regarding Wright's prior assaults risks devolving into a series of minitrials about whether each prior assault by Wright actually happened, but this concern does not justify excluding all testimony about Wright's prior assaults. Rule 403 allows trial judges

to limit evidence whose "probative value is substantially outweighed by a danger of . . . confusing the issues, . . . wasting time, or needlessly presenting cumulative evidence." While it may have been needlessly cumulative and a waste of time to have seven witnesses testify as to Wright's prior acts, allowing some testimony about Jones's knowledge of Wright's reputation and prior assaults would inform the jury as to Jones's fear without wasting time or confusing the issues. Thus, the district court should not have barred Jones from testifying regarding the facts warranting his apprehension.

Jones argues that the court also abused its discretion by disallowing testimony that would have impeached Wright's claim that he only carried a gun at work. Under the circumstances that Jones's claim of duress was based on the threatened arson of his house, rather than fear of Wright shooting him, there was no abuse of discretion.

The district court's decision not to allow Wright to testify regarding prior assaults by Wright that Jones knew of and Wright's reputation for violence was not harmless error. From our assessment of the record as a whole, we cannot say with fair assurance that the judgment was not substantially swayed by the error, and accordingly, this error affected Jones's substantial rights. *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946) (stating standard). The question of whether Jones was coerced raised two factual issues for the jury to decide: (1) whether Wright threatened Jones, and (2) whether Jones was put in fear by Wright's threat. The evidence of Jones's knowledge of Wright's prior assaults and reputation for violence was highly probative of the second issue. Admittedly, this same evidence raises risks of propensity for the first issue, but a defendant has a right to introduce evidence to inform the jury about his state of mind, subject to other evidentiary

limitations such as Rule 403. Without the evidence of Wright's prior assaults (including assaults against Jones, a threat of arson against a third party, and the commission of arson against Wright's own home) the jury was not provided with context that could explain why Jones would take the threat of burning down his house seriously even though he said he was not worried about being shot by Wright.

In addition, the Government selectively presented evidence of an amicable relationship while the district court kept out evidence of prior assaults by Wright against Jones. The Government elicited testimony which painted a friendly picture of the relationship between Jones and Wright. Government witness Harold Salley said that Wright and Jones knew each other and Wright would barbecue at Jones's house while Jones worked on Wright's car. Similarly, Government witness Fred Huff said he had seen Jones and Wright together and they got along as far as he knew. In its closing argument, the Government referred to Salley's testimony and reminded the jury that Wright would occasionally spend time at Jones's house barbecuing there. This testimony and argument made it appear less likely that Jones would take Wright's threats seriously. If the jury had been presented with testimony about Wright's prior threats, it might have understood Wright to be less of a friend and more of a bully.

The strongest counterargument is that the jury did not believe Jones's duress defense because he lied to the investigators about his participation in the arson even after Wright was arrested, and thus was not a credible witness. However, even if Jones was not forthcoming with the police, the jury may have acquitted Jones if it had been presented with a stronger factual basis to support

Jones's duress argument. There is a risk that the evidence of Wright's prior assaults and reputation for violence would primarily have served to bolster Jones's credibility merely due to propensity—it would be an impermissible propensity inference to argue that because Wright assaulted Jones in the past, Jones's account of Wright's actions is more credible. But this is the type of risk that often arises with Rule 404(b) evidence and, under Rule 403, the probative value of the evidence going to Jones's state of mind was not substantially outweighed by the risks of confusing the issue. From our review of the record as a whole, the district court's error was not harmless.

In conclusion, the district court's error in limiting Jones from testifying about his knowledge of prior assaults by Wright and Wright's reputation for violence warrants reversal. Should Jones be retried, the district court does not have to exercise its discretion in the same way and may revisit whether Jones made a prima facie case of duress. This discretion includes determining whether it is worthwhile to admit testimony by other witnesses corroborating prior assaults that Jones was aware of. If a factual dispute arises regarding the occurrence of the prior assaults, such testimony's probative value could weigh in favor of admissibility. *See Burks*, 470 F.2d at 435 n.5.

III.

We now address those evidentiary issues raised on appeal to the extent they present legal issues and are likely to arise on retrial. *See In re Gen. Motors Corp.,* 3 F.3d 980, 985 (6th Cir. 1993).

A. *Wright's Prior Convictions*

Before trial, Jones notified the Government that he intended to cross-examine Wright regarding five of his prior convictions, to attack Wright's credibility. At trial, the district court granted the Government's motion *in limine* and held that Wright's criminal history was not relevant and, to the degree that it was relevant, was more prejudicial than probative. On appeal, Jones challenges the exclusion of four of Wright's convictions.

Jones challenges the district court's refusal to admit Wright's 2003 felony conviction for attempted receiving and concealing a stolen motor vehicle under Michigan Compiled Laws § 750.535(7). He argues that the court could "readily determine" that the crime involves a "dishonest act or false statement," rendering it admissible under Rule 609(a)(2). But establishing the elements of receiving and concealing a stolen motor vehicle under Michigan law does not "require[] proving—or the witness admitting—a dishonest act or false statement." Fed. R. Evid. 609(a)(2). Michigan Compiled Laws § 750.535(7) says "A person shall not buy, receive, possess, conceal, or aid in the concealment of a stolen motor vehicle knowing, or having reason to know or reason to believe, that the motor vehicle is stolen, embezzled, or converted." The district court could not readily determine that a conviction under § 750.535(7) entails a dishonest act or false statement. As we explained in *United States v. Washington*, 702 F.3d 886, 892–94 (6th Cir. 2012), the phrase "a dishonest act or false statement" in Rule 609(a)(2) refers to some element of active misrepresentation rather than crimes such as robbery or theft that are better thought of as crimes of violence or stealth and "have little bearing on a witness's character for truthfulness." *Id.* at 893.

Receiving and concealing a stolen motor vehicle is more like a crime of stealth such as theft than a crime of active misrepresentation such as forgery. The evidence of Wright's conviction under Michigan Compiled Laws § 750.535(7) was not admissible under Rule 609(a)(2) and the district court did not err in declining to admit the evidence under that rule.

We recognize, however, that as a crime punishable by a year or more imprisonment, Wright's 2003 conviction for attempted receiving and concealing a stolen motor vehicle could be admissible under Rule 609(a)(1)(A), but such admission would be subject to Rule 403 —and the similar balancing test at Rule 609(b) if more than ten years passes between Wright's release for the 2003 conviction and Jones's retrial.

Jones's challenge to the disallowance of Wright's 2001 misdemeanor conviction under Grosse Pointe Park Ordinance § 16-126 for false personation, in contrast to the motor vehicle conviction, involves "a dishonest act or false statement" for purposes of Rule 609(a)(2). The Grosse Pointe Park Ordinance reads:

> No person shall in any manner disguise himself or falsely assume or pretend to be another, with intent to obstruct the due execution of the law, or with intent to intimidate, hinder or interrupt any public safety officer or any other person in the legal performance of his duty, or in the exercise of his rights under the constitution and laws of this state or the Charter and ordinance of this City, whether such intent be effected or not.

The most natural understanding of the ordinance is that a violation involves active misrepresentation. False personation is generally considered a type of fraud, *see* Jeffery C. Barnum, Comment, *False Valor:  Amending the Stolen Valor Act to Conform with the First Amendment's Fraudulent Speech Exception*, 86 Wash. L. Rev. 841, 865 (2011) ("Most jurisdictions, as well as the

U.S. Department of Justice categorize the crime of false personation as a subset of fraud."), and the purpose of false personation is generally to deceive someone.

While the crime qualifies under Rule 609(a)(2), it is still subject to the time restrictions of Rule 609(b), which the district court should consider if this evidence is put forth on remand.

The district court did not abuse its discretion in concluding that the probative value of Wright's 1999 felony conviction for attempted possession with intent to deliver cocaine under fifty grams did not substantially outweigh its prejudice.

A twelve-year-old conviction for attempted delivery of cocaine provides little probative value as to the witness's credibility. This crime did not involve dishonesty or a false statement. Introducing evidence of the crime could prejudice the Government's case by tempting the jury to focus on Wright's prior involvement with drugs rather than the substance of Wright's testimony. While prior felonies are relevant to a witness's credibility, *see Davis v. Alaska*, 415 U.S. 308, 316 (1974), Jones has not shown that, based on the specific facts and circumstances of Wright's crime, the probative value substantially outweighed the prejudicial effect. Our determination that the court below did not abuse its discretion, however, does not preclude the district court from reconsidering its exercise of discretion on remand.

The district court correctly concluded that Wright's 2003 misdemeanor conviction for retail fraud in the third degree was inadmissible under Rule 609 because the conviction was neither punishable by a year or more in jail nor did it involve dishonesty or a false statement.

Wright was convicted of Michigan Compiled Laws § 750.356d(4), which provides:

> A person who does any of the following in a store or in its immediate vicinity is guilty of retail fraud in the third degree, a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $500.00 or 3 times the value of the difference in price, property stolen, or money or property obtained or attempted to be obtained, whichever is greater, or both imprisonment and a fine:
>
> (a) While a store is open to the public, alters, transfers, removes and replaces, conceals, or otherwise misrepresents the price at which property is offered for sale, with the intent not to pay for the property or to pay less than the price at which the property is offered for sale, if the resulting difference in price is less than $200.00.
>
> (b) While a store is open to the public, steals property of the store that is offered for sale at a price of less than $200.00.
>
> (c) With intent to defraud, obtains or attempts to obtain money or property from the store as a refund or exchange for property that was not paid for and belongs to the store, if the amount of money, or the value of the property, obtained or attempted to be obtained is less than $200.00.

While subsections (a) and (c) suggest active misrepresentation, subsection (b) also includes shoplifting, which this court has previously said is not a conviction involving dishonesty or false statement. *See Washington*, 702 F.3d at 893 (citing *United States v. Scisney*, 855 F.2d 325, 326 (6th Cir. 1989)). Because a court can not readily determine that a conviction under Michigan Compiled Laws § 750.356d(4) required proving or admitting a dishonest act or false statement, the district court did not err in limiting Jones's cross-examination of Wright as to Wright's conviction for retail fraud.

### B. *Written Statement by Owner of the Store*

The district court properly excluded a statement that the owner of the store made to the ATF agents. In the statement, the store owner said Wright brandished a gun, told the store owner that he started the fire, and said "you better not say anything." Trial Tr. vol. 4 July 5, 2011, 231. Subsequent to making this statement, the owner of the store invoked his Fifth Amendment right

against self-incrimination, did not make further statements, and informed the prosecution that he was not interested in testifying in Jones's trial. At trial, Jones sought to introduce the store owner's statement to the ATF agents, arguing that despite its status as hearsay, it was a deprivation of Jones's due process rights for this statement to be excluded. The district court sustained the Government's objection on hearsay grounds, saying "you don't get in on due process when you've got a hearsay statement." *Id.* at 232.

The district court's statement was overbroad, but on the current facts, the district court properly ruled against admissibility. Jones argues that *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)—which says that in some circumstances "the hearsay rule may not be applied mechanistically"—supports the admissibility of this statement. The circumstances in *Chambers* are miles apart from the present circumstances. *Chambers* was a murder trial in which the defendant sought to present evidence that another man, McDonald, had sworn that he committed the crime and confessed to three friends shortly after the murder. McDonald later repudiated his confession. Under Mississippi's rules of evidence at the time, Chambers could not cross-examine McDonald or introduce testimony by the three people to whom Chambers had confessed. *See id.* at 285–94. Under Mississippi's hearsay rules, declarations against pecuniary interest were admissible while declarations against penal interest were not. *See id.* at 299. The Supreme Court determined that under the circumstances, Chambers's due process rights had been violated. *See id.* at 302–03. The keys to the Supreme Court's reasoning were the importance of the testimony to Chambers's defense and the trustworthiness of McDonald's statements to his friends. The Supreme Court identified four

aspects of the testimony that made it reliable: (1) each was made spontaneously to a friend shortly after the murder, (2) each was corroborated by physical evidence, (3) each statement was unquestionably self-incriminatory, and (4) McDonald was present in the courtroom and under oath. *See id.* at 300–01.

In this case on the other hand, the owner of the store made a statement to ATF agents that was not self-incriminatory, but rather can be understood as seeking to excuse his own role in the arson by alleging that he too had been coerced by Wright. In addition, this statement was not as critical to Jones's defense as McDonald's statements were to Chambers's defense. While there are times that due process requires that hearsay rules give way, this is not one of those times and the district court's ruling was not in error.

For the foregoing reasons, Jones's conviction is reversed. We vacate Jones's conviction and sentence, and remand to the district court for further proceedings consistent with this opinion.

**HELENE N. WHITE, Circuit Judge**, concurring.    I concur, but write separately to clarify some points.

Because the district court correctly determined that Jones made a prima facie case of duress, I would not open the door to relitigation of that issue on remand.  Additionally, although I agree that evidence of Wright's gun-carrying practices was not directly relevant to the duress defense because Jones was fearful of Wright's threat to set a fire, not his threat to use the gun, on remand the court should consider whether the credibility contest between Wright and Jones is such that the collateral nature of the issue does not substantially outweigh the value of witness testimony that Wright carries a gun even when not at work, notwithstanding his testimony to the contrary.  In all other respects, I concur in section II of the majority opinion.

Regarding section III of the majority opinion, I think it important to note because Wright is a witness and not a defendant, Federal Rule of Evidence 609(a)(1)(A) makes certain criminal convictions presumptively admissible, subject only to Rule 403:

> (1) for a crime that . . . was punishable by death or by imprisonment for more than one year, the evidence:
>
>     (A) must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant[.]

Fed. R. Evid. 609(a)(1)(A).  Rule 403 favors admissibility:

> The court *may* exclude relevant evidence *if* its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403 (emphasis added).  In contrast, Rule 609(a)(1)(B) sets forth a different rule when the witness is the defendant in a criminal trial:

> (1) for a crime that . . . was punishable by death or by imprisonment for more than one year, the evidence:
> . . .
>    (B) must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to the        t h a t defendant[.]

Fed. R. Evid. 609(a)(1)(B).

Lastly, to the extent that the ten-year period of Rule 609(b) is triggered by the passage of time since the first trial, thus triggering a different standard of admissibility,[1] it is appropriate that the district court consider that Wright's credibility is a crucial issue in the case.

---

[1]Rule 609(b) states:

(b) Limit on Using the Evidence After 10 Years.  This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later.  Evidence of the conviction is admissible only if:

> (1) its probative value, supported by specific facts and circumstances substantially outweighs its prejudicial effect[.]

Fed. R. Evid. 609(b)(1).